UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SHARON MEEHAN,                          :
                    Plaintiff,          :
                                        :
        v.                              :       C.A. No. 19-560-WES-PAS
                                        :
QUICKEN LOANS, INC.,                    :
                    Defendant.          :


**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In October 2019, Plaintiff Sharon Meehan, an *in forma pauperis* litigant, filed her *pro se*

complaint in this Court.  Ms. Meehan has accused Defendant Quicken Loans, Inc. ("Quicken"), a

mortgage company, of injuring her through fraud and misrepresentation by wrongfully diverting

the proceeds of her mortgage loan to her brother and deceptively altering her mortgage closing

documents to cover up this alleged misconduct.  ECF No. 1 ("Complaint" or "Compl.").

The operative Complaint is terse.  In it, Ms. Meehan claims that she was the sole Trustee

of her deceased father's Trust ("Trust"), which owned the family home where she had long

resided, 325 Saw Mill Road, North Scituate, Rhode Island (the "Real Estate").  Compl. ¶¶ 6-9.

In 2016, she alleges that she approached Quicken about a mortgage loan to finance her purchase

of the Real Estate from the Trust.  Id. ¶ 10.  According to the pleading, Quicken agreed to a loan

of $288,526, with $46,410 of the proceeds to pay-off a preexisting mortgage owed to Citizens

Bank and a second pay-off ($228,000)[1] to go to Ms. Meehan as Trustee for distribution to herself

and the other Trust beneficiaries (her six siblings and/or their offspring *per stirpes*).  Id. ¶ 11; see

---

[1] This amount is specified as $228,000 in the Complaint, but as $228,000.05 in some of the proffered evidence.
E.g., ECF No. 46-23.  The five-cent difference is not material.  In the interest of simplicity, the Court will
consistently refer to it as $228,000.

ECF 46-12 at 3.  On March 9, 2017, Ms. Meehan claims that she signed "closing papers" reflecting these terms, but that Quicken sent the loan proceeds for the second pay-off ($228,000) to her brother, James Meehan ("James") in Colorado, instead of to her.  Id. ¶¶ 12-13.  Ms. Meehan alleges that Quicken subsequently altered the closing documents and, since the closing, has maintained altered documents that "incorrectly attempt to establish that Plaintiff authorized the unlawful distribution [to James]."  Id. ¶ 14.  Based on these facts, Ms. Meehan claims that Quicken committed fraud by making unspecified false representations, which she relied on to her detriment, and engaged in negligent misrepresentation by providing false information through the failure to exercise reasonable care.  Id. ¶¶ 15, 17-18, 21-22.  She seeks compensatory and punitive damages and an injunction to bar Quicken from bringing collection or foreclosure proceedings against her.  Compl. at 4-5.

Quicken responded to Ms. Meehan's Complaint with a motion to dismiss (ECF No. 8); the Court denied the motion in light of Ms. Meehan's *pro se* status but cautioned that the pleading "may not stand up to summary judgment once discovery has been conducted."  Text Order of Sept. 14, 2020.  Following the Court's ruling, discovery was vigorously pursued by both parties, with the frequent need for judicial intervention.  E.g., Meehan v. Quicken Loans, Inc., C.A. No. 19-560WES, 2021 WL 2826090 (D.R.I. July 7, 2021).  After discovery closed, Quicken timely filed the instant motion for summary judgment.  ECF No. 46.

The time of reckoning has now come.  Quicken's motion for summary judgment is fully briefed and ripe for decision.  It has been referred to me for report and recommendation.  See 28 U.S.C. § 636(b)(1)(B).  I have carefully reviewed the parties' submissions, including Ms. Meehan's deposition, her Exhibits, her Affidavit and that of her then-fiancé, now husband, Roger Williamson, and I have listened to all of the six authenticated recordings proffered by Quicken of

Ms. Meehan and Mr. Williamson speaking with various Quicken representatives.  These recordings (which are solidly corroborated by the rest of Quicken's proffer) blatantly contradict the Complaint's material factual allegations.  Guided by the Supreme Court's holdings in <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007), and <u>Intel Corp. Inv. Pol'y Comm. v. Sulyma</u>, 140 S. Ct. 768, 779 (2020), as well as our Circuit's holding in <u>Campos v. Van Ness</u>, 711 F.3d 243, 245 (1st Cir. 2013), that, at summary judgment, the court "should not adopt" a nonmovant's version of facts when it is "blatantly contradicted" by objective evidence (such as these recordings), so that no reasonable jury could believe it, I recommend that the Court enter judgment against Ms. Meehan and in favor of Quicken.[2]

## I.      STANDARD OF REVIEW

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 255 (1986) (internal quotation marks omitted).  A "genuine" issue is one that "properly can

---

[2] Having invested substantial judicial resources in managing the discovery phase of this case and, at summary judgment, in reviewing the entirety of the record presented by both parties, I alert the District Court to the following *sua sponte* observation: I am extremely concerned that Ms. Meehan's Complaint may not have been filed in good faith but rather was brought for an improper purpose.  This observation echoes findings made during the discovery phase of the case.  <u>See</u> <u>Meehan</u>, 2021 WL 2826090, at *2-3 & n.3 (finding that Ms. Meehan had propounded discovery for sole purpose of harassment; noting evidence that Mr. Williamson had left threatening and foul messages for at least one proposed deponent); <u>id.</u> at *2 & n.4 (finding that Plaintiff's "hyperbolic accusations at defense counsel," including "vicious *ad hominem* attacks," amount to a "pattern" requiring "Court's investing substantial judicial resources to find that the accusations do not withstand scrutiny").  Despite this conduct, Ms. Meehan continually has enjoyed the benefit of her *pro se* status, although, in the circumstances of this case, the Court has found that its "obligation of 'liberal' treatment of a *pro se* [litigant]" has resulted in "strain[]" that at times has seemed to go "past the breaking point."  <u>United States v. Dickerson</u>, CR419-072, 2020 WL 7234516, at *2 n.3 (S.D. Ga. Sept. 9, 2020), <u>adopted</u>, 2020 WL 5904940 (S.D. Ga. Oct. 6, 2020).  Because Ms. Meehan's purpose in bringing this case is beyond the scope of what is in issue in connection with the pending motion for summary judgment, it will not be discussed further in this report and recommendation.

be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Id. at 250. A "material" fact is one that "might affect the outcome of the suit under the governing law." Id. at 248. Summary judgment should be denied if there is sufficient evidence such that a jury could return a verdict for the nonmoving party. Id. at 249-52.

The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is therefore entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). For the nonmovant, avoidance of summary judgment "requires hard evidence of a material factual dispute; the opposition cannot be conjectural or problematic [but] must have substance." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (internal quotation marks omitted). "[A] mere promise to produce admissible evidence at trial does not suffice to thwart the summary judgment ax." Garside v. Osco Drug, Inc., 895 F.2d 46, 49 (1st Cir. 1990). During the summary judgment phase, the court should not rely on credibility assessments; "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990); see Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016) (court may disregard affidavit containing argument or speculative assertions not made on the basis of personal knowledge); Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991) (court need not "give credence to mere allegations, or draw inferences where they are implausible or not supported by specific facts") (internal quotation marks omitted).

The Supreme Court and our Circuit have provided specific guidance regarding how trial courts should approach certain evidence proffered at the summary judgment phase. Several well-settled principles are pertinent to this case.

First, the Supreme Court has consistently held that, for purposes of summary judgment, a nonmovant's version of the facts cannot create a genuine dispute of material fact when it is "blatantly contradicted" by objective evidence in the record (as a videotape) such that no reasonable jury could believe the nonmovant's version. Scott, 550 U.S. at 380-81; see Intel Corp. Inv. Pol'y Comm., 140 S. Ct. at 779 (if nonmovant's version of facts is "blatantly contradicted by the record," "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment") (internal quotation marks omitted); Campos, 711 F.3d at 245 ("where the non-movant's account is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment") (internal quotation marks omitted); Davis v. Wetzel, Civil Action No. 1:18-CV-00804, 2020 WL 3642382, at *12 n.13 (M.D. Pa. July 6, 2020) ("declaration cannot create a genuine dispute of material fact when it is blatantly contradicted by objective evidence in the record, such as a videotape") (internal quotation marks omitted). This principle has been applied equally to audio recordings as to video recordings. Coble v. City of White House, 634 F.3d 865, 868-69 (6th Cir. 2011) (issue for court at summary judgment whether audio recording blatantly contradicted plaintiff's testimony such that no reasonable juror could believe plaintiff's version).[3]

---

[3] These cases are referred to herein collectively as "Scott and progeny."

Second, hearsay evidence that would be inadmissible at trial, whether or not embodied in an interrogatory answer or affidavit, cannot be considered on a motion for summary judgment. Garside, 895 F.2d at 50.

And third, the nonmovant's burden cannot be satisfied with a declaration that "without proper explanation" contradicts his/her prior deposition testimony.  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (internal quotation marks omitted); Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 203 (D.P.R. 2013) ("[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed") (internal quotation marks omitted).  Pursuant to this so-called "sham affidavit" doctrine, such averments may be disregarded by the court.  A.J. Amer Agency, Inc. v. Astonish Results, LLC, C.A. No. 12-351 S, 2014 WL 3496964, at *12 (D.R.I. July 11, 2014). The sham affidavit doctrine cures the unfairness of permitting a litigant to introduce a material fact by affidavit at the summary judgment phase if that fact was omitted from the litigant's testimony procured during a thorough and focused deposition; to consider an averment presented for the first time in the affidavit "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact" and would deprive the opposing party of an "opportunity to cross-examine."  Perma Research. & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).  Summary judgment may be granted if the only disputed fact is presented in an averment that was omitted from the claimant's deposition, to which the court concludes "no reasonable jury could afford . . . evidentiary weight."  Harvey v. Cline, No. 3:18-cv-939, 2021 WL 1627766, at *12 (M.D. Pa. Apr. 27, 2021) (internal quotation marks omitted).

## II.    PROCEDURAL AND FACTUAL BACKGROUND

A.    <u>**Summary of the Evidence and Approach to Evidentiary Issues**</u>

In compliance with our Local Rules, DRI LR Cv 56(a), Quicken's summary judgment motion was accompanied by its Statement of Undisputed Facts, which appropriately cites to potentially admissible evidence to support each fact.  ECF No. 47 ("SUF").  This evidence includes Ms. Meehan's deposition and interrogatory responses, as well as declarations[4] authenticating material documents (including Ms. Meehan's loan application as originally submitted and in final, as well as the loan closing documents, particularly the closing disclosure as maintained in Quicken's business records).  Most significant – and dispositive of this motion – are the six authenticated recordings of Ms. Meehan and/or Mr. Williamson speaking with Quicken employees and (in one instance) an employee of the title company.  Verniers Dec., Exs. 6-10; MacLeman Dec. II, Ex. 1.  These recordings are drawn from telephone calls on Quicken's recorded line, of which there are more than fifty between January 31, 2017, and the closing on March 9, 2017, involving Ms. Meehan, and/or Mr. Williamson and Quicken loan team members; all of them were produced during discovery in this case.  SUF ¶ 27; Verniers Dec. ¶ 10; MacLeman Dec. I, Ex. 4.

In opposition, Ms. Meehan has sweepingly asserted that she "disputes," ECF No. 52, virtually every[5] paragraph in Quicken's Statement of Undisputed Facts including those that were drawn directly from her Complaint (<u>e.g.</u>, SUF ¶ 4), and those that she confirmed as true during her deposition (<u>e.g.</u>, SUF ¶ 7).  To support her assertion that each fact in Quicken's SUF is

---

[4] The four authenticating declarations are: MacLeman Declaration I (ECF No. 46-2, "MacLeman Dec. I"); Verniers Declaration (ECF No. 46-11, "Verniers Dec."); Courtney Declaration (ECF No. 46-25, "Courtney Dec.") and MacLeman Declaration II (ECF No. 54-8, "MacLeman Dec. II").  Some of the documents were also authenticated by Ms. Meehan in her deposition and some were authenticated by Ms. Meehan's brother James.

[5] Ms. Meehan "agreed" only with SUF ¶¶ 1-2, which identify her and Quicken.

"disputed,"[6] Ms. Meehan relies principally on evidence to which Quicken has vehemently objected – her own Affidavit and that of Mr. Williamson, ECF No. 52-2 ("Meehan Aff."); ECF No. 52-3 ("Williamson Aff."), as well as three of the Exhibits attached to the Meehan opposition. ECF Nos. 52-4, 54-10, 54-11 ("Meehan Exs. A, G, H"). An initial issue for the Court to address is Quicken's request that the Affidavits and these three Exhibits should not be considered at all.

Apart from having been filed as unsigned and unsworn (as Quicken correctly has pointed out),[7] the Court acknowledges that there are significant problems with the Meehan/Williamson Affidavits.[8] First, portions of them are materially inconsistent with testimony in Ms. Meehan's deposition (raising the specter of the sham affidavit doctrine). Second, they ask the Court to accept as true unsupported representations of Ms. Meehan and Mr. Williamson regarding what

---

[6] In some instances, Ms. Meehan advised the Court that she disputed a fact in Quicken's SUF; however, review of Ms. Meehan's explanation reveals nothing more than argument. See, e.g., ECF No. 52 ¶¶ 6-8. These "disputes" have been disregarded.

[7] After Quicken's reply asked the Court not to consider the Meehan/Williamson Affidavits because they are unsigned and unsworn, ECF No. 54 at 5, Ms. Meehan emailed new versions of the Affidavits to the Clerk's Office with typed names on the signature lines, backdated to July 24, 2021. However, Ms. Meehan did not file these questionable substitutes, leaving the Court with Affidavits that are unsigned and unsworn. While troubled by the lack of Affidavits that were clearly signed under penalties of perjury, in light of Ms. Meehan's *pro se* status, I decline to disregard them for this reason, instead assuming that they were timely filed as signed and sworn.

[8] I have one other concern about the Meehan Affidavit (not mentioned by Quicken) that I have not considered in this report and recommendation because Ms. Meehan is *pro se* and because the case is at the summary judgment phase when credibility may not be considered: that is, it appears (at least partially) to have been written by Mr. Williamson. The Court bases this observation on the pronouns used in each of the two Affidavits. Mr. Williamson's Affidavit consistently refers to himself in the first person and to Ms. Meehan in the third person, while the Meehan Affidavit has sections that are verbatim replications of Mr. Williamson's affidavit, except for an inconsistent shift in the pronouns, referring to Ms. Meehan at times in the third person and at times in the first person. E.g., Meehan Aff. at 6 ("since I was Sole Trustee she did not need a mortgage"); Williamson Aff. ¶ 12 ("since the Plaintiff was sole Trustee she did not need a mortgage"). This observation echoes a similar concern that arose during a Zoom hearing in this case held on June 15, 2021, during which Ms. Meehan answered the Court's questions by parroting words being audibly whispered to her by a male voice. In connection with summary judgment, I did not explore, and have not considered, the questionable provenance of the Meehan Affidavit.

others will say,[9] particularly the hearsay declarations of the notary (Jacob Lane)[10] who was present at the March 9, 2017, closing of the mortgage loan.  And last, the material portions of these Affidavits are blatantly and repeatedly contradicted by the statements of Ms. Meehan and Mr. Williamson on the six recordings proffered by Quicken.  Despite these flaws, and mindful of Ms. Meehan's *pro se* status, I decline Quicken's invitation that the Court should categorically disregard these Affidavits.  Instead, I have carefully considered these deficiencies in the context of determining, as to each material fact they are presented to controvert, whether they are competent to raise a trial-worthy fact dispute.

The other evidence that Quicken has challenged out of the gate is attached to the Meehan opposition as Exhibits A, G, and H.  Supported by the declaration of its attorney, Quicken represents that these documents were not produced in discovery so that it was denied the opportunity to explore their authenticity or provenance.  MacLeman Dec. II ¶ 8.  But for Ms. Meehan's *pro se* status, this well-founded objection should be explored and might be sustained. Instead, the Court has examined each of these documents carefully to determine if it potentially gives rise to a material issue of fact.  Because they do not for the reasons discussed *infra*, there is no need for the Court to reach Quicken's request that they not be considered based on Ms. Meehan's alleged failure to produce them.

Ms. Meehan's deposition also calls for preliminary comment.  Quicken has not challenged the deposition as unworthy of any consideration by the Court.  To the contrary,

---

[9] Some of Quicken's hearsay objections are unfounded.  For example, Quicken labels as hearsay the declarations of its own employees.  ECF No. 56 at 4.  As statements of the employees of a party opponent made within the scope of employment during the employment relationship, such declarations are not hearsay.  Fed. R. Evid. 801(d)(2)(D). These hearsay objections are ignored.

[10] For purposes of this report and recommendation, the Court has disregarded the representation of Quicken's counsel that Mr. Lane declined to provide a sworn statement because of threats against him made by Mr. Williamson.  ECF No. 54 at 6 n.4.

Quicken relies on Ms. Meehan's refusals to answer and, when she did answer, the material inconsistencies between her testimony and both the Complaint and the Meehan/Williamson Affidavits.  Nevertheless, the deposition has several vexing features noted below.

At the beginning of the deposition, Ms. Meehan set the tone by testifying that she has trouble with her memory due to a car accident resulting in a concussion in 2019; "[i]f my memory lapses, there's nothing I can do about that."  ECF No. 46-5 ("Meehan Depo.") at 6-8.[11] Then, throughout most of her testimony, when pressed for details supporting her claim, Ms. Meehan did not struggle to give responsive answers due to memory lapses; to the contrary, she responded by repeatedly lashing out at her brother James and Quicken, while refusing to answer or evading the question.  For example, when asked the pivotal question – "[w]hat are those documents that [Quicken] altered?"  Ms. Meehan responded:

> I signed documents at my closing that I believe were for a refinance[12] because I was told by Quicken Loans I was the sole trustee.  So I am not certain – I don't trust Quicken Loans for anything.  They're liars and so is [my brother James] Meehan.  So it's very hard for me to say this is exactly what I did.  The question you're asking me I can't answer at this time.  Sorry.

Meehan Depo. at 83.  The transcript is replete with other examples.  E.g., id. at 85 (when asked if Quicken's closing disclosure of record was altered, Ms. Meehan responded, "I refuse to answer on the basis that Quicken Loans has lied and so has my brother."); id. at 93 (when asked about her signature on the contract to purchase, "it looks like my signature but it's invalid.  It's under false pretense.  I had liars coming at me.  You may find other documents that I signed; they were

---

[11] Citations to Ms. Meehan's deposition are to the transcript page number and *not* to the ECF page number.

[12] During the deposition, one of Ms. Meehan's recurrent themes is that she was told her mortgage loan was to be structured as a "refinance," but it was not.  E.g., Meehan Depo. at 80.  This testimony makes no sense – Ms. Meehan's mortgage loan closing documents as authenticated by Quicken reflect that the transaction was a "Refinance," exactly as Ms. Meehan testified she expected.  Verniers Dec., Ex. 12.  This allegation is missing from Ms. Meehan's Complaint.

signed under false pretense.").  Troublingly consistent with the testimony that, whenever her

signature might seem real, it was procured through unspecified "false pretenses," is a note with

which Ms. Meehan was confronted during the deposition, written in what she conceded appears

to be her handwriting that she had produced (apparently inadvertently) to Quicken.  Labeled as

"strategy," it includes the following:

> I wanted it on the record that I have not signed any documents that have been
> requested or and/or sent prior to closing of house and are not valid because they
> were obtained under false pretenses. . . .  Any e-mails that may have sounded . . .
> [illegible] prior to March 9th are invalid because they were obtained under false
> pretenses.

Meehan Depo. at 119.  While not disputing that she had produced this note, Ms. Meehan could

not explain it or this "strategy."  Meehan Depo. at 120; see Joseph v. Lincare, Inc., 989 F.3d 147,

156-57 (1st Cir. 2021) (when party produces document in discovery, "the other [party] should be

able to treat the document as authentic unless someone offers some reason to think otherwise,

before it is too late to do something about it"); Fareed v. Cent. Rivers Power MA, LLC, Civil

Action No. 3:20-11053-MGM, 2021 WL 3634158, at *5 (D. Mass. Aug. 17, 2021)

("[d]ocuments produced in discovery are deemed authenticated") (internal quotation marks

omitted).

The result is a transcript packed with refusals to answer and evasive responses that hurl

vague accusations but omit many of the "facts" that Ms. Meehan and Mr. Williamson introduced

post-discovery when they filed their Affidavits and Exhibits with their opposition to summary

judgment.  As noted, Quicken argues that this discrepancy requires the Court to disregard the

Affidavits pursuant to the sham affidavit doctrine.  ECF No. 54 at 18.  Mindful of Ms. Meehan's

*pro se* status and the complexity introduced by her opening testimony about her concussion,[13] I

---

[13] If the omissions in the deposition were actually due to memory lapses, the Court could find them to be
"explained" and would eschew reliance on the sham affidavit doctrine.  See A.J. Amer Agency, Inc., 2014 WL

have avoided reliance on the sham affidavit doctrine as solely dispositive of any element of Ms.

Meehan's claim.  Nevertheless, I have also noted in the factual exposition that follows where

there are material discrepancies between Ms. Meehan's testimony on one hand and the

Meehan/Williamson Affidavits on the other.  In one instance, I have invoked the sham affidavit

doctrine as a secondary basis for my proposed findings and recommendation.

   **B.** **Mr. Williamson**

   Mr. Williamson's role in this case is unusual.  Ms. Meehan avers that he was her fiancé

during the events in issue and that, more recently, they married.  Meehan Depo. 76.  She has

testified that information regarding the foundation for her claim should be procured from Mr.

Williamson because he "was involved in 99 percent of this."  Id. at 11-12; see id. at 19

(complaint was drafted by "Roger and I").  She repeatedly testified that he was and is authorized

to act and speak for her, both during the underlying transaction and during the case.  Id. at 11, 44,

67, 71-72, 75, 94; see id. at 99 (Ms. Meehan confirms that Mr. Williamson was "a person who

could speak for [her] with Quicken Loans about this mortgage transaction").[14]  Further, Mr.

Williamson himself has claimed that he is legally sophisticated in that he has "a law degree."

Verniers Dec., Ex. 7 at 14:22-23[15] (during recorded call on February 8, 2017, Mr. Williamson

advises Quicken employee and title company representative, "I do have a law degree.").[16]

---

3496964, at *12.  The problem is that the material omissions arise either because Ms. Meehan answered
emphatically and omitted the material fact, or because she was evasive or refused to answer; they do not arise
because Ms. Meehan was struggling to give a responsive answer but could not recall a detail.

[14] Based on this testimony, it is clear that Mr. Williamson's statements on the recordings are not hearsay.  See Fed.
R. Evid. 801(d)(2)(C) (statement by person authorized by party to make statement concerning the subject is not
hearsay).  In any event, Ms. Meehan has not objected to Mr. Williamson's statements as hearsay.

[15] Citations to the telephone recordings are to the timestamps visible in the recordings at or near the time of the
quoted dialogue.

[16] One aspect of Mr. Williamson's history will be relevant if this case survives summary judgment.  That is, in
weighing Mr. Williamson's credibility, the fact finder may consider his October 28, 2016, felony convictions, inter
alia, for witness intimidation, forgery, money laundering, uttering a false writing, false statement under penalty of

An issue regarding Mr. Williamson to be dealt with at the threshold is Ms. Meehan's repeated testimony during her deposition that one of the most material of Quicken's misdeeds in preparing incorrect closing documents was that Mr. Williamson "was a co-applicant on the original application" and should have been named on the mortgage loan documents.  Meehan Depo. at 12-15.  Ms. Meehan made the same representation in signed writings that she filed in this Court: twice, she unsuccessfully[17] moved to amend the Complaint to make the claim that Mr. Williamson's name should have been on the documents and alleging that Mr. Williamson's name was omitted from "several documents that were changed."  ECF Nos. 20, 27.  In the Meehan and Williamson Affidavits, this contention is repeated as part of Ms. Meehan's opposition to the motion for summary judgment.  See Meehan Aff. at 9; Williamson Aff. ¶ 31.

This allegation – that Mr. Williamson was a co-applicant who was wrongfully omitted from the loan documents – is blatantly contradicted by both Mr. Williamson and Ms. Meehan.  For example, during a recorded conversation with Quicken and an employee of the title company on February 8, 2017:

| | |
|---|---|
| Title Co. Employee: | Are you intending to keep the property in yours and Roger's name solely. . . . |
| Mr. Williamson: | Just Sharon. . . .  Just Sharon. |
| Ms. Meehan: | It is just my name. . . .  Roger's name is not on this.  It is just me. |
| | . . . . |
| Mr. Williamson: | It's gonna be in Sharon's name.  My name is not involved. |

_____

perjury, publishing false financial statements, fraudulent securities sales, larceny, and being a common and notorious thief.  Fed R. Evid. 609; see Commonwealth v. Williamson, 1577-CR-00635 (Mass. Super. Ct., Essex Cty.) (docket).  At summary judgment, these are entirely irrelevant.

[17] Each motion to amend was denied without prejudice because Ms. Meehan failed to include a draft of the proposed pleading.  Text Order of Nov. 25, 2020; ECF No. 30.

Verniers Dec., Ex. 7 at 22:41-55; 23:07-09.  These statements (that the only borrower was Ms.

Meehan) are uniformly corroborated by all of the documents related to the mortgage loan, which

clearly state that the loan was to be in Ms. Meehan's sole name (as an "unmarried woman"); they

are also repeatedly confirmed during other recorded conversations.  E.g., Verniers Dec., Exs. 8,

10.  Most importantly, these statements are consistent with what is alleged in the Complaint,

which states that Ms. Meehan (only) was the mortgage loan applicant for the purpose of "her"

(only) purchasing the Real Estate from her father's Trust.  Compl. ¶¶ 10, 12.  Collectively, this

evidence and the Complaint's allegations dramatically conflict with the contrary proposition

(that Mr. Williamson was wrongfully omitted as a co-borrower) as presented in Ms. Meehan's

deposition and representations to the Court, as well as in the Meehan/Williamson Affidavits.

Mindful that Ms. Meehan's summary judgment opposition rests in part on this allegation, ECF

No. 52 ¶ 18, I have disregarded it not only because it is blatantly contradicted by the audio

recordings, see Scott and progeny, so that no fact finder would believe it, but also because it is

irrelevant in that it clashes with the factual allegations in Ms. Meehan's Complaint.

### C.    Disputed and Undisputed Facts through End of January 2017

For purposes of this case, it is undisputed that the Real Estate was owned by a Trust set

up by Ms. Meehan's father for the ultimate benefit of his seven children, including Ms. Meehan.

SUF ¶¶ 6-7.  While Ms. Meehan has testified to family confusion and discord regarding which

sibling (Ms. Meehan or her brother, James, or both) was the Trustee of the Trust, e.g., Meehan

Depo. at 23-25, for purposes of this case, it is undisputed that Ms. Meehan became the sole

Trustee of the Trust at the end of 2014, following the death of her mother, as well as that Ms.

Meehan has long resided in the Real Estate and wanted to keep it in her family, while the other

siblings were scattered across the country.  SUF ¶ 8; MacLeman Dec. I, Ex. 1; Meehan Depo. at

109-10; Meehan Aff. at 1.  The authenticity of the Trust document proffered by Quicken

(Verniers Ex. 1) is not disputed by Ms. Meehan.  Meehan Depo. at 90; see Verniers Dec. ¶ 5 &

Ex. 1.  It describes Ms. Meehan's duty as Trustee to the beneficiaries of the Trust: "my trustees

shall distribute the Family Trust in equal shares to such of my children . . . as are then living,

provided, that if descendants are then living of a deceased child of mine, [distribution shall be

per stirpes]."  Verniers Dec., Ex. 1 ¶ 4.2.  The Trust also provided that the Trustee "may permit

any beneficiary . . . to occupy such real estate rent free."[18]  Id. ¶ 5.14.

It is undisputed[19] that in October 2016, Ms. Meehan approached Quicken about a loan

secured by the Real Estate to provide financing for her purchase of the Real Estate from the

Trust, with the proceeds of the loan to be distributed to the Trust beneficiaries pursuant to its

terms.  SUF ¶ 9; Compl. ¶ 10.  During a recorded call on October 24, 2016, Ms. Meehan and Mr.

Williamson discussed with Quicken her difficulty in qualifying for the loan she wanted because

of her poor credit score.  MacLeman Dec. II, Ex. 1 at 5:45-6:45.  During this conversation, Ms.

Meehan and Mr. Williamson described to Quicken the transaction they then hoped Ms. Meehan

could qualify for: a purchase of the Real Estate from Ms. Meehan's brother James, who had

agreed to "gift" Ms. Meehan $54,000 of equity and who would be flexible regarding what

amount he would "need[] to get out of the house."  Id. at 5:45-50; 7:34-35.  This recorded

conversation is consistent with an October 12, 2016, Contract to Purchase "our family home,"

which Ms. Meehan submitted to Quicken.  Verniers Dec. ¶ 6 & Ex. 2.  This early version of the

---

[18] Ms. Meehan alleges that this provision of the Trust meant that she was "not obligated to sell this house, since I am living in it" and that her decision "to take out a mortgage for the home value of $228,000 and divide it up 1/7th each" was to "keep peace and happiness with my family."  Meehan Aff., Ex. H.

[19] The Meehan and Williamson Affidavits tell a somewhat different story about their initial 2016 dealings with Quicken.  See Meehan Aff. at 2-6; Williamson Aff. ¶¶ 2-9.  The version in the text is drawn from the Complaint, which Ms. Meehan confirmed in her deposition.  Meehan Depo. at 22, 24.

15

proposed transaction shows Ms. Meehan as buyer and her brother James as seller, for a price of $305,000, with a "gift of equity" of $54,000 from "[o]ur family" to "Sharon"; it is signed by James and Ms. Meehan with no reference to either as Trustee.  Verniers Dec., Ex 2; SUF ¶ 13. In argument, without explaining how or why, Ms. Meehan has asserted that this document is "a central part of this [f]raud plot," ECF No. 52 ¶ 13, although she authenticated it, while claiming that she signed it because her brother lied to her.  Meehan Depo. at 92-95; id. at 92 ("Jim's a liar."); id. at 93 ("This was a con job.").

It is difficult to ascertain from the record reflecting these 2016 events what was actually going on.  For example, it is unclear whether Ms. Meehan's statements about the 2016 dealings with her brother James are based on Ms. Meehan's mistaken belief (which Ms. Meehan attributes to her brother's "lie") that James was the sole Trustee or a co-Trustee, with the power to control decisions about the Real Estate.  See Meehan Depo. at 23-24, 92-93; Meehan Aff. at 3-4.  What matters is that this factual confusion does not give rise to a material factual dispute.[20]

What is material and undisputed is that, at some point in late 2016 or early 2017, Ms. Meehan came to know that she had been the sole Trustee since 2014.  Meehan Depo. at 21, 25. Once she understood that she was the sole Trustee, it is also undisputed that Ms. Meehan became aware from Quicken that there would be difficulties in getting a loan approved by "the underwriters" if it was structured with Ms. Meehan as sole Trustee selling the Real Estate to herself in her individual capacity.  ECF No. 52 ¶ 13.  As Ms. Meehan acknowledged, "I . . . was in fact sole Trustee and could not buy the home from myself."  Meehan Aff. at 4; see Williamson Aff. ¶ 5 (acknowledging proposition allegedly known to James that "Plaintiff was sole Trustee and could not buy the home from herself would never get approved for a mortgage").

---

[20] Quicken has not disputed Ms. Meehan's allegations regarding the Meehan family tensions.

The next undisputed event occurred sometime soon after Ms. Meehan first contacted Quicken, when Ms. Meehan entered into a home equity line of credit ("HELOC") agreement with Citizens Bank secured by the Real Estate, on which she borrowed $46,410 to pay off debts she had incurred for her children's education.  SUF ¶ 15; Meehan Depo. at 25-28; Compl. ¶ 11. The record does not reveal whether the other Trust beneficiaries acquiesced to (or were even aware of) Ms. Meehan's personal use of these proceeds of the Real Estate.  Ms. Meehan asserts that she did this because Quicken suggested that her personal debt would be a problem for "the underwriters."  ECF No. 52 ¶ 15; Meehan Depo. at 25 ("they wanted me to clean up the debt").

During January 2017, Ms. Meehan asserts that she proposed a new structure for the loan both to Quicken and her siblings.  On January 15, 2017, she claims she signed a "Dear Quicken Loans" letter stating in pertinent part:

> I have chosen to apply for a Refinance Loan with Quicken Loans to give my siblings money from the property as a buy-out from Mom & Dad's House . . . .  I agree to take out a Refinance Mortgage and pay each Sibling 1/7th share of the home's current value . . . .  I agree to send Brother James . . . his 1/7th portion in the amount of $32,571.42 directly to him.  The balance of $195,428.58 will be sent to me Sharon Meehan Sole Trustee for disbursement to the remaining 6 of us.

Meehan Aff., Ex. G.  And on January 27, 2017, Ms. Meehan claims she signed a "Dear Family" letter representing that the mortgage would be "for the home value of $228,000," and describing the same structure ($32,571.42 to James and $195,428.58 to Ms. Meehan for distribution per Trust).  Meehan Aff., Ex. H.

Ms. Meehan has presented Exhibits G and H in support of her argument in her opposition to Quicken's motion for summary judgment that this is the structure that was set out in the mortgage loan documents that she signed at the closing on March 9, 2017.  ECF Nos. 52-1 at 1-2; 53 at 1-2.  Quicken has challenged the authenticity of Exhibits G and H, arguing that they were not produced during discovery and made their first appearance in the case attached to Ms.

17

Meehan's opposition.  ECF Nos. 54 at 13; 56 at 3.  The Court need not resolve this evidentiary challenge; whether authentic or not, these documents purport to describe a structure that Ms. Meehan <u>proposed</u> to Quicken on January 15, 2017.  Meehan Aff. Ex. G.  They do not purport to describe a structure that was ever agreed to by Quicken; nor is there a scintilla of evidence that Quicken ever agreed to this structure.  Further (and fatal to this argument), the transaction described in the Complaint itself is materially different from the transaction described in Meehan Exhibits G and H.  For example, the pleading alleges that the documents that Ms. Meehan signed at the March 9, 2017, closing were supposed to reflect that Quicken agreed that the total mortgage was $288,526 (not $228,000), with $46,410 going to Citizens to pay off the HELOC and second payoff ($228,000, not $195,428.58) to go to Ms. Meehan herself for distribution "pursuant to the terms of the Trust."  Compl. ¶ 11.  The Complaint has no mention of paying $32,571.42 to James.  Exhibits G and H do not give rise to a disputed issue of fact for trial.

After ostensibly sending Exhibits G and H earlier in January, on January 31, 2017, Ms. Meehan presented to Quicken an application for an FHA refinance mortgage in an amount that is materially different from Exhibits G and H but largely consistent with what ultimately would appear in Quicken's closing documents.  SUF ¶ 14; Verniers Ex. 3.  In her deposition, Ms. Meehan did not dispute the authenticity of this document.  Meehan Depo. 88 ("I may have filled this out because I was told to fill it out this way").

### D.  <u>Disputed and Undisputed Facts in February 2017</u>

Quicken has proffered evidence establishing that, by the end of February 2017, documents had been signed by Ms. Meehan and her siblings solving what Ms. Meehan admits she understood was a barrier to her being approved for a Quicken mortgage loan: "[t]he fact is the Plaintiff's original application kept getting refused by the underwriters because she was 'Sole

Trustee' and you can't buy from yourself."[21]  ECF No. 52 ¶ 13; see Williamson Aff. ¶ 23. Pursuant to the factual scenario reflected in these documents, Ms. Meehan had resigned as Trustee in favor of her brother James with the consent of her siblings and, acting as successor Trustee, her brother James had executed a quitclaim deed transferring the Real Estate to Ms. Meehan in her individual capacity with the expectation that a refinance mortgage loan from Quicken to Ms. Meehan in her individual capacity would be disbursed to pay-off the Citizens HELOC, with the balance to be disbursed to James as successor Trustee for distribution to the Trust beneficiaries.  SUF ¶¶ 11-12.

Consistent with this factual scenario, in her deposition, Ms. Meehan did not dispute the authenticity of a group of executed "To Whom it May Concern" letters dated February 8 and 13, 2017, and thereafter, by which she resigned as Trustee and she (and her other siblings) agreed to the appointment of her brother James as successor Trustee.  Meehan Depo. at 105 (testifying about MacLeman Dec. I, Ex. 1) ("These are nonbinding, nonlegal documents that Quicken Loans wanted created to push this through.").  Rather, she testified that she could not say one way or the other whether she signed the pertinent documents, but insisted that she did not have to resign, that the idea for her to resign came from Quicken and that she was told these resignation documents would be "used for in-house purposes only."  Meehan Depo. at 93, 102; see Verniers Ex. 6 at 1:08-2:35 (recording of Ms. Meehan and Mr. Williamson complaining that transfer of trusteeship to James "wasn't even needed").  On February 16, 2017, James signed a Trustee Certificate confirming that he had become the Trustee with the power to convey the Real Estate.

---

[21] Quicken points out that this proposition, which Ms. Meehan admits was consistently communicated to her and Mr. Williamson as the position of Quicken's underwriters and the title company, is firmly grounded in Rhode Island trust law.  Sinclair v. Indus. Nat. Bank of Providence, 89 R.I. 461, 469, 153 A.2d 547, 551 (1959) ("trustee is held to a high degree of loyalty to the beneficiaries of his trust"); see Cuzzone v. Plourde, No. 03-0524, 2005 WL 2716749, at *2 (R.I. Super. Ct. Oct. 17, 2005) ("the general rule is that trustees should remove themselves when a conflict of interest arises that may compromise their duty of loyalty to the beneficiaries of a trust," with an exception if the settlor specifically approved of the self-dealing transaction).

MacLeman Dec. I, Ex. 2; see MacLeman Dec. II, Ex. 5 ¶ 3 (James' authentication of Trustee Certificate).

Ms. Meehan tries to evade this evidence with an averment in the Meehan/Williamson Affidavits that she omitted from her deposition – that a Quicken employee told Ms. Meehan and Mr. Williamson on "approximately" January 6, 2017, that these documents (which were not executed until February 2017 and thereafter) were null and void because they were procured by fraud. Meehan Aff. at 8; Williamson Aff. ¶¶ 23-26. Blatantly contradicting this claim – that Quicken told her that the transfer of the role of Trustee from herself to James was void – is a recorded conversation between Quicken and Ms. Meehan and Mr. Williamson on February 8, 2017, during which Mr. Williamson confirmed with Quicken: "the check for the proceeds of the house . . . goes to [James] and [James] is the one who divvies up the money." Verniers Ex. 7 at 2:42-52. During the same conversation, Ms. Meehan stated that it was "perfectly fine" that James would receive the "payout" at the closing because she "anticipated [that] to happen." Id. at 22:27-22:34. Indeed, both Ms. Meehan and Mr. Williamson admitted that James had the "final say on everything" and that it was up to him to "disburse funds." Id. at 16:33-44; see also id. at 14:02-16 (Ms. Meehan confirming that James will disburse Trust funds). This structure was reaffirmed in a recorded conversation on February 13, 2017, in which Mr. Williamson confirmed with Quicken that the transaction would be a refinance and that "Jim is who the check is going to be payable . . . to disburse funds to the people involved." Verniers Ex. 8 at 1:46-52.

Also consistent with the factual scenario as posited by Quicken, on February 16, 2017, Ms. Meehan's brother James, acting as successor Trustee, executed a quitclaim deed in Colorado (where he lived) transferring the Real Estate from the Trust to Ms. Meehan. SUF ¶ 16. A copy of this quitclaim deed has been authenticated by James and by a Quicken employee, who has

averred that it is a true copy of what was provided to Quicken in connection with Ms. Meehan's mortgage loan.  MacLeman Dec. II, Ex. 5; Verniers Dec. ¶ 8, Ex. 5.

### E.        Disputed and Undisputed Facts in March 2017 and Thereafter

In a recorded call on March 2, 2017, with Quicken, Ms. Meehan and Mr. Williamson, Ms. Meehan acknowledged that she had just received a copy of materials from the title company including the quitclaim deed signed by James. Verniers Dec., Ex. 6 at 00:17-50.  During this call, Mr. Williamson asked Quicken to explain the executed quitclaim deed, including to confirm the accuracy of their (that is, Ms. Meehan's and Mr. Williamson's) understanding of how it fit into the transaction.  Mr. Williamson stated:

> It has her brother James, successor Trustee of the . . . Trust, grantor, . . . for $228,000 . . . paid/grant, to Sharon, an unmarried woman, grantee.  Am I to interpret this that he had to be put on because Sharon can't buy the house from herself and all this is . . . is . . . Sharon's title that says she is the owner of this house?

Id. at 1:08-44.  The Quicken employee confirmed: "That is my understanding, but I am not a title specialist."  Id. at 1:45-47.  Mr. Williamson expressed dissatisfaction with this approach – "the problem that we had with this whole thing is . . . [James] was never a Trustee and it put his name on the Trust because Sharon signed that paper to relinquish the Trust but we were told afterward by [a Quicken employee] that that paper wasn't even needed because he was never a Trustee so Sharon can just take out a refinance."  Id. at 2:12-35.  In response, Quicken told them that this was an issue within the purview of the title company and suggested that they contact the title company for a further explanation.  Id. at 1:45-55; 2:40-53.

In her deposition, Ms. Meehan denied having had this conversation and denied having seen the fully executed quitclaim deed until April 2017, well after the March 9, 2017, closing.  Meehan Depo. at 29-30, 86, 98-99.  With no evidence to support the assertion, Ms. Meehan's

opposition brief argues that "this Quitclaim deed document, being one of the documents in question has been back dated and this was told to the Plaintiff by the Notary in Colorado."[22] ECF No. 52 ¶17.

On the next day following the recorded conversation of March 2, 2017, described above, Mr. Williamson had another recorded call with Quicken during which he confirmed his understanding of the structure of the transaction – that, at the closing, James would not be the seller because "[Sharon] already owns the property" and that "Jim is . . . deeded off the property." Verniers Dec., Ex. 9 at 1:21-25; 2:30-35. As to sending proceeds to James (and not delivering them to Ms. Meehan), Mr. Williams confirmed, "Sharon is the one who does the signing and Jim gets a check and that's the end of it." Verniers Dec., Ex. 9 at 2:26-30.

On March 8, 2017, the day before the closing, a Quicken employee called on the recorded line and spoke to Mr. Williamson about setting up the closing. Verniers Dec., Ex. 10. Mr. Williamson asked to schedule the closing with Ms. Meehan (who was required to be present as the only party signing the documents) on the next day (March 9, 2017) at their home; Quicken agreed. Id. at 1:06-12; 1:29-34; 1:58-2:00; 2:26-2:47. Quicken told Mr. Williamson that a notary would bring the closing documents, which also were being loaded into a database that Ms. Meehan and Mr. Williamson could immediately access for review before the closing. Id. at 3:02-3:14. Clearly audible on the recording, the Quicken employee carefully and methodically went over every material financial detail that appears in the closing documents, all of which Mr. Williamson specifically confirmed as correct:

- the final loan amount would be $288,526, id. at 4:02-07;

- Quicken would be "paying off a James Meehan mortgage of $228,000," id. at 3:31-35;

---

[22] This argument regarding what the Colorado notary told Ms. Meehan is rank hearsay, which the Court may disregard.

- Quicken would also be "paying off a Citizens Bank mortgage of $46,410.91." id. at 3:47-51; and

- these disbursements would not occur on March 9, but would be sent out on March 14, 2017, id. at 2:55-3:02; 6:05-07.

These financial details are identical to the financial details in Quicken's authenticated closing disclosure and the original closing documents dated March 9, 2017, that have been maintained since the closing by Quicken in the regular course of its business.  SUF ¶ 19 (authenticated closing disclosure and settlement statement signed by Ms. Meehan reflects that disbursement of $228,000 to go to James); Courtney Dec., Exs. 1-2 (same).  These closing documents include Ms. Meehan's signed authorization for the title company to disburse $228,000 to James and $46,410.91 to Citizens Bank.  SUF ¶ 20 (citing Verniers Dec. ¶ 17, Ex. 13).  During her deposition, Ms. Meehan authenticated Quicken's closing disclosure as a document she signed at the closing.  Meehan Depo. at 82-83.  Importantly, Ms. Meehan has not raised any coherent factual basis for disputing either of these pivotal facts (SUF ¶ 19 and SUF ¶ 20) in her SUF response.  ECF No. 52 ¶¶ 19-20.[23]

Ms. Meehan purports to dispute Quicken's proffer with four different versions of what she and Mr. Williamson claim happened at the closing.

First is the version in the Complaint in which Ms. Meehan claims that Quicken agreed to a loan of $288,526, with $46,410 of the proceeds to pay-off the Citizens Bank HELOC and the

---

[23] Somewhat illogically, Ms. Meehan purports to dispute Quicken's facts (SUF ¶¶ 19-20) authenticating the closing documents, which reflect that she authorized the post-closing distribution of $228,000 to James, by reprising her mantra that "this was a refinance, not a sale" (see n.12 supra), as well as in reliance on her claim that she was induced to relinquish her status as Trustee to James by her brother's "fraudulent means and lies."  ECF No. 52 ¶ 19; see also ¶ 20 ("this was a refinance").  In addition, Ms. Meehan disputes SUF ¶ 20 by claiming that Mr. Jacob Lane, the closing notary, would "attest" that this "document . . . was not part of the closing documents" and would "testify" that he put a "large 'X'" on "[a]ny documents signed at closing."  ECF No. 52 ¶ 20.  The latter is hearsay and may be disregarded.  Otherwise, Ms. Meehan has not presented anything to controvert the authenticity of these pivotal closing documents.

second payoff ($228,000) to go to Ms. Meehan herself as Trustee.  Compl. ¶ 11.  On March 9,

2017, Ms. Meehan claims that she signed closing papers reflecting these terms, but that Quicken

sent the loan proceeds ($228,000) to her brother James in Colorado, instead of to her.  Id. ¶¶ 12-

13.  Quicken then altered the closing documents to reflect that this disbursement was authorized.

Id. ¶ 14.  As noted, this version is entirely belied by Ms. Meehan's and Mr. Williamson's

statements during the recorded calls, as well as by the loan application and closing documents

(Verniers Ex. 3, 4, 12, 13), whose authenticity Ms. Meehan has not substantively disputed.

Second, during her deposition, Ms. Meehan testified that, at the closing on March 9,

2017, she and Mr. Williamson reviewed the documents brought by the notary, Mr. Jacob Lane.

She claims that they discovered two serious errors – the omission of Mr. Williamson as a co-

borrower and the omission of the check.  Meehan Depo. at 13-15, 17.  After contacting Quicken

by telephone, Quicken agreed to overnight corrected documents (in two days) with the check and

Ms. Meehan was told (by Quicken) to, and did, sign all of the documents Mr. Lane brought to

the closing.  Id. at 17-18.  Before he left, Mr. Lane gave Ms. Meehan a copy of everything she

had signed.[24]  Id. at 58-60.  A year later, a set of the closing documents were sent to her by

Quicken; this set differed from the set she had signed at the closing in that it included a quitclaim

deed, which she "did not sign."  Id. at 59-61.  She was unable to recall any other differences.

Meehan Depo. at 60-61; see also id. at 52-53, 86-87.  Indeed, she was unable to say if there were

any differences between the closing disclosure of record at Quicken (which shows she signed off

on a closing contemplating that the pay-off of $228,000 would go to James and the pay-off of

$46,410.91 would go to Citizens Bank) and the one she remembered signing at the March 9,

---

[24] At her deposition, Ms. Meehan testified that she was then in possession of this copy of what she actually signed, given to her by Mr. Lane, and that it would be produced.  Meehan Depo. at 59-60.  This document has never been produced.  SUF ¶¶ 35-37.

2017, closing.  Meehan Depo. at 82-83.  Ms. Meehan's deposition testimony provides no support for her Complaint's allegation that the closing documents were altered to reflect that the proceeds were to be sent to James.

In her Affidavit, Ms. Meehan avers to a third version, beginning with the hearsay declaration of Mr. Lane, the notary, that it was "strange[]" for the check for the proceeds to be omitted from the closing documents.[25]  Meehan Aff. at 9-10; Williamson Aff. ¶ 29.  Ms. Meehan claims that she, Mr. Williamson and Mr. Lane immediately contacted Quicken by telephone about their concerns; Quicken's employee ("Jeremy") advised them that the check had been sent by mistake to James.  Meehan Aff. at 10; see Williamson Aff. ¶ 31.  Quicken asked Ms. Meehan to sign everything even though the documents would have to be reissued to correct the numbers that were wrong and to add Mr. Williamson who had been omitted in error.  Meehan Aff. at 9-10.  The Quicken employee said there would be an immediate stop payment placed on the check sent to James by mistake and told Mr. Lane to "strike a line or X out" the "information that was wrong."  Meehan Aff. at 10; see also Williamson Aff. ¶¶ 31-33.  Ms. Meehan signed these erroneous documents as requested but neither the check nor the corrected documents were ever sent.  Meehan Aff. at 10.  Ms. Meehan has attached to her opposition brief Exhibit A, which she claims is an example of a page with an "X" applied by Mr. Lane.  Meehan Ex. A.[26]

---

[25] This hearsay declaration attributed to Mr. Lane is blatantly contradicted by what Quicken told Mr. Williamson during the recorded call the day before the closing – no disbursements would be made until March 14, 2017, which is three business days post-closing.

[26] Exhibit A is a one-page document that appears to be an unexecuted copy of the last page of the quitclaim deed that had been signed by James and notarized in Colorado (where James lived) on February 16, 2017.  Compare Verniers Dec., Ex. 5, with ECF No. 52-4.  Exhibit A has a blank line for James' signature as the grantor and a block to be filled in and signed by the notary.  ECF No. 52-4.  In the notary block on Exhibit A, handwritten information for Mr. Lane as notary is printed on the appropriate lines, seemingly preparatory to a signature being notarized by Mr. Lane.  Id.  A large "X" is drawn through the notary block in which Mr. Lane's information is printed.  Thus, on its face, Meehan Exhibit A is not a page from the closing documents that Ms. Meehan signed.  Nothing about Exhibit A permits the inference that the closing documents that Ms. Meehan signed on March 9, 2017, were all marked through with an "X" by Mr. Lane.  Exhibit A does not give rise to a trial-worthy fact dispute.

Ms. Meehan's written argument (in her opposition brief and her response to Quicken's SUF) tells a fourth version. She argues that the closing documents that she authorized and signed at the closing directed Quicken to deliver a check in the amount of $195,428.58 to her as Trustee at the closing and to send $32,571.42 to her brother James in advance of the closing. ECF No. 53 at 1. In contrast to her deposition testimony that Mr. Lane gave her a copy of the closing documents she signed, in this version, she asserts that these documents have disappeared because, the notary (Mr. Lane), took them "away"; further, every page that she signed at the closing had an "X" through the page. ECF No. 52 ¶ 35. There is no evidence to support this version of what happened at the closing – Ms. Meehan purports to buttress it by reference to Meehan Exhibits A, G and H. However, as noted *supra*, assuming they are authentic, Exhibits G and H relate to a transaction structure that Ms. Meehan <u>proposed</u> in January 2017; they do not reflect a structure to which Quicken agreed; nor do they reflect the structure described in the Complaint. Similarly, Exhibit A provides no support for the proposition that the closing documents signed by Ms. Meehan were marked with a "X." <u>See</u> n.26 *supra*. Relatedly and with no evidentiary support, Ms. Meehan argues that her signature on the closing documents maintained by Quicken was a "cut n paste or copied and dropped onto new documents." ECF No. 52 ¶ 35.

Following the closing, the record is replete with facts proffered by Ms. Meehan and Mr. Williamson focused on post-closing events, particularly related to whether her brother James could have access, and did get access, to any of the closing documents. <u>E.g.</u>, Meehan Depo. at 35. None of this is relevant to what is in issue in the Complaint.

F.    **Damages**

26

Quicken asks the Court to grant its motion based on Ms. Meehan's failure to articulate or submit any evidence of damages.  ECF No. 46-1 at 7, 24-25.  During her deposition, Ms. Meehan was asked whether she experienced any damages that she links to the claims in her Complaint.  Meehan Depo. at 106-10.  In response, she vaguely testified that she blamed Quicken for "my reputation, my family, my current state of credit, the lies from Quicken Loans that the things they said they were going to honor and did not," Meehan Depo. at 108, but otherwise, she declined to answer: "I don't want to talk about it."  Id. at 107.  Similarly, in her initial disclosures, Ms. Meehan did not provide any information regarding her claim of damages.  MacLeman Dec. I, Ex. 7 at 5.

In her argument in opposition to the motion for summary judgment, Ms. Meehan contends that she was damaged because she was not given the check (in this version, she claims for $195,428.58) for distribution to the Trust beneficiaries; because this amount was sent to her brother James, she claims she did not get her share of the proceeds.  ECF Nos. 52-1 at 2; 53 at 2. This argument makes no sense as damages arising from a claim against Quicken.  Unless Ms. Meehan planned to wrongfully divert the proceeds from her siblings and was prevented from doing so by the delivery of the proceeds to her brother James in his capacity as Trustee, it should not matter who is the Trustee to whom the proceeds were delivered.  And if her brother violated his duty as Trustee and failed to give Ms. Meehan the share to which she was entitled, her claim is against him.  Also argued for the first time in opposition to the motion for summary judgment (with no facts to support the claim) is Ms. Meehan's allegation that Quicken failed to send the full pay-off amount to Citizens Bank for the HELOC, causing Citizens Bank to sue and damaging Ms. Meehan's credit score.  Meehan Aff. at 16; ECF No 53 at 5-6.  Quicken's alleged

failure to send the pay-off to Citizens Bank is not a claim that appears in the Complaint; any

resulting damages should be disregarded as irrelevant.

## III.    LAW AND ANALYSIS

Under Rhode Island law, "[t]o establish a *prima facie* fraud claim, the plaintiff must

prove that the defendant made a false representation intending thereby to induce [the] plaintiff to

rely thereon and that the plaintiff justifiably relied thereon to his or her damage."  McNulty v.

Chip, 116 A.3d 173, 182-83 (R.I. 2015) (internal quotation marks omitted).  For a claim of

negligent misrepresentation, a plaintiff must

> establish the following elements: (1) a misrepresentation of a material fact; (2) the
> representor must either know of the misrepresentation, must make the
> misrepresentation without knowledge as to its truth or falsity or must make the
> representation under circumstances in which he ought to have known of its falsity;
> (3) the representor must intend the representation to induce another to act on it;
> and (4) injury must result to the party acting in justifiable reliance on the
> misrepresentation.

Zarrella v. Minnesota Mutual Life Insurance Co., 824 A.2d 1249, 1257 (R.I. 2003) (internal

quotation marks omitted).

Essential to either claim is that the claimant must show that the defendant made a false

representation – whether fraudulent or negligent – to influence the claimant's conduct, as well as

reasonable or justified reliance.  Becker v. Indep. Bank, 305 F. Supp. 3d 351, 358-60 (D.R.I.

2018); McNulty, 116 A.3d at 182-83; Zarrella, 824 A.2d at 1257.  Damages are also a required

element of both a claim of fraud and a claim of negligent misrepresentation under Rhode Island

law.  McNulty, 116 A.3d at 182-83; Zarrella, 824 A.2d at 1257.  When a claimant has no

evidence of damages after an opportunity for discovery, summary judgment is appropriate.

Great Lakes Exteriors, Inc. v. Dryvit Sys., Inc., No. 99-CV-70449-DT, 2000 WL 1279167, at *4

(E.D. Mich. Aug. 16, 2000), aff'd, 22 F. Appx 613 (6th Cir. 2002) ("[s]ince [party] has had a

sufficient opportunity for discovery and has no evidence to support the essential element of damages, summary judgment is appropriate").

Ms. Meehan's case fails on every element.

Most fundamental, there is no competent evidence from which a fact finder could conclude that Quicken made a representation to Ms. Meehan that it would enter into an agreement, pursuant to which it would loan her $288,526, secured by a mortgage on the Real Estate, of which Quicken would pay $228,000 of the proceeds to Ms. Meehan as Trustee. Rather, after the evidence that the Court should disregard is sifted out, what remains is undisputed and pellucid. That is, Ms. Meehan <u>wanted</u> to borrow the money to refinance the sale of the Real Estate from herself as Trustee to herself individually with the loan proceeds delivered to herself as Trustee. But Quicken – because of the objections of its underwriters and the title company – consistently advised her that it declined to make the loan on that basis. There is no evidence appropriate for consideration at the summary judgment phase that Quicken ever represented to her that it had agreed to do so.

Ms. Meehan's failed attempt to buttress her factual allegation that a check for $228,000 should have been given to her at the closing rests principally on the averments in the Meehan/Williamson Affidavits that a Quicken employee named "Jeremy" told her (and Mr. Williamson and Mr. Lane) during the March 9, 2017, closing that a check for $228,000 should have been given to Ms. Meehan at the closing; that it was a mistake to have already sent it to James; that a stop payment would be placed on the check sent to James and it would be reissued payable to Ms. Meehan; and that Ms. Meehan should sign the erroneous closing documents (which she did) because corrected documents would be sent for signature by her and Mr.

Williamson, who (in this version) should have been a co-borrower.[27]  Meehan Aff. at 10; Williamson Aff. ¶¶ 31-33.  These averments loosely echo Ms. Meehan's testimony during her deposition, when she stated that Mr. Lane called Quicken during the closing because of the missing check, as well as because of the omission of Mr. Williamson from the closing documents, and that a Quicken employee told her to sign the incorrect documents "because in two days they would overnight the proper documentation along with the check."  Meehan Depo. at 17-18.

These Affidavit averments (and the deposition testimony) clash clearly and dramatically with every one of the recorded calls from February and March 2017 that Quicken has proffered, culminating in the call of March 8, 2017, during which every material component of these averments is blatantly contradicted.  See Scott and progeny.  Specifically, Ms. Meehan herself affirmed on February 8, 2017, her understanding that it was "perfectly fine" that James would receive the "payout" at the closing because she "anticipated [that] to happen," as well as that Mr. Williamson's name did not belong on any of the closing documents (Verniers Dec., Ex. 7 at 22:27-22:34; 22:41-55; 23:07-09); Mr. Williamson, acting for Ms. Meehan, affirmed on February 13, 2017, that James "is who the check is going to be payable" (id., Ex. 8 at 1:46-52); Mr. Williamson, acting for Ms. Meehan, affirmed on March 2, 2017, that "Sharon is the one who does the signing and Jim gets a check and that's the end of it" (id., Ex. 9 at 2:26-30); and Mr. Williamson, acting for Ms. Meehan, affirmed on March 8, 2017, (the day before the closing), their understanding that only Ms. Meehan would be signing documents, that no funds would be

---

[27] It must be noted that this story, as told in the Meehan/Williamson Affidavits, appears to clash with the version in the Complaint to the extent that the Complaint alleges that the documents signed at that closing properly reflected that the check was to be payable to Ms. Meehan but were later altered (Compl. ¶¶ 12-14), while the Affidavits aver that the documents signed at the closing were incorrect and "Jeremy" told them that corrected documents would be sent for them both to sign shortly.  Meehan Aff. at 9-10; Williamson Aff. ¶¶ 30-31.

disbursed until after the closing, and that, when disbursement occurred three business days later, the check for $228,000 would be sent to James (id., Ex. 10 at 1:06-12; 1:29-34; 2:55-3:02; 3:31-55, 6:05-07).  In light of the objective evidence on these recordings, no reasonable jury could believe Ms. Meehan's implausible version of what happened during the closing.  See Campos, 711 F.3d at 245.  Therefore, her version should be disregarded.  See Scott and progeny.

Ms. Meehan also attempts to rely on one other arguably pertinent statement, which is alleged in the Affidavits to have been made by a Quicken employee: Ms. Meehan and Mr. Williamson both aver that, on "approximately" January 6, 2017, Quicken's Grant Wachler told Ms. Meehan that her relinquishment of her position as Trustee of the Trust was null and void. Meehan Aff. at 8; Williamson Aff. ¶¶ 23-26.  These averments also fail to give rise to a trial-worthy fact dispute.  First, the alleged Quicken statement may be disregarded because it is blatantly inconsistent with the recorded calls that occurred after this alleged statement supposedly was made; these calls consistently reflect Ms. Meehan and Mr. Williamson acknowledging their understanding of (and dissatisfaction with) the transfer of the Trusteeship to James.  E.g., Verniers Ex. 6 at 1:08-2:35 (recording of Ms. Meehan and Mr. Williamson complaining about title company's insistence on transfer of trusteeship to James and representing that they had been told by one Quicken employee in past that transfer "wasn't even needed").  Second, this supposed statement by Quicken as averred to in the Affidavits may be disregarded pursuant to the sham affidavit doctrine because there is no satisfactory explanation for its omission from Ms. Meehan's deposition testimony, during which she was closely questioned about precisely what was said by Mr. Wachler during this conversation, yet she made no mention of him declaring that not-yet-signed documents relinquishing the Trusteeship in favor of James

would be null and void.[28]  Harvey, 2021 WL 1627766, at *12 (omission of key allegation from

deposition renders affidavit that includes it "sham affidavit" such that "no reasonable jury could

afford it evidentiary weight").  Whether analyzed under Scott and progeny or under the sham

affidavit doctrine, Ms. Meehan's newly minted (in the Affidavit) version of events would not be

believed by a fact finder because it is implausible.  That is, it is illogical to posit that Quicken

told Ms. Meehan in early January 2017 that documents that she and her siblings *did not execute*

until February 2017 and thereafter were null and void.  Nor is it plausible to posit that she was

induced by fraud to relinquish her position as Trustee because her brother lied by claiming he

was the Trustee; if her brother falsely persuaded her that he was Trustee, there was no need for

her to relinquish a role she believed she did not have.  Relatedly, it simply does not make sense

that Ms. Meehan and Mr. Williamson would rely on an oral statement by Quicken to void a not-

yet-executed inter-family transaction involving various of Ms. Meehan's siblings to which

Quicken was not a party.  See Medina-Munoz, 896 F.2d at 8 (summary judgment appropriate if

nonmovant relies on improbable inferences).

  Otherwise, the evidence is crystal clear – as she and Mr. Williamson repeatedly affirmed

during the recorded conversations with Quicken, Ms. Meehan attended the closing fully aware

---

[28] During her deposition, Ms. Meehan described her conversation with Grant Wachler and another person from Quicken:

> They had good news for me and bad news for me.  The good news is that I am the sole trustee . . . and that . . . I should not be applying for a mortgage, rather a refinance. . . . The bad news is that my brother's been lying to me this whole time, and he is not a co-trustee; that's what they told me.

Meehan Depo. at 42-43.  When twice pressed whether Mr. Wachler said anything else, Ms. Meehan said the only other thing he told her was that, for a refinance, "they would have it done in about six weeks or so."  Id. at 43.  In her Affidavit, Ms. Meehan repeated her testimony that she spoke to Grant Wachler of Quicken, who called to give her "some good news and bad news."  Meehan Aff. at 8.  Echoing her deposition, Ms. Meehan testified that, "[t]he good news is that after 3 months, Quicken Legal Department has proven the Plaintiff is indeed the 'Sole Trustee' of her family's Trusts."  Id.  However, the Affidavit then adds what Ms. Meehan omitted from her deposition: "Mr. Wachler also stated the letter the Plaintiff signed to relinquish her control as Trustee of the Family Trust is now null and void since it was obtained under fraudulent means."  Meehan Aff. at 8; see Williamson Aff. ¶ 23 (same).

that the loan proceeds were to be sent to her brother James, who had stepped into her shoes as Trustee with the responsibility to disburse funds to the Trust beneficiaries.  See, e.g., Verniers Dec., Exs. 7 at 14:02-16; 16:33-44; 22:27-34; 10 at 1:06-6:07.  She clearly understood that Quicken would not approve a loan structure that resulted in paying the loan proceeds to her. Verniers Dec., Ex. 6 at 1:08-44 ("Sharon can't buy the house from herself").  There is no trial-worthy evidence permitting the inference that Ms. Meehan's decision to close the loan was made in reliance on a Quicken representation that Mr. Lane, the notary, would come to the closing with a check payable to her for $228,000.  Nor is there any trial-worthy evidence that Ms. Meehan's decision to sign the closing documents was made in reliance on a representation by "Jeremy" or some other Quicken employee that a check for $228,000 would shortly be delivered to her.  Nor is there a scintilla of evidence worthy of consideration at the summary judgment phase that Quicken altered or falsified the closing documents – indeed, when asked the pivotal question during her deposition ("What are those documents that [Quicken] altered?"), Ms. Meehan lashed out with the accusation that Quicken and James are all "liars" and otherwise refused to answer.  Meehan Depo. at 83. And finally, Ms. Meehan has failed to present any evidence that she was damaged by the complained-of conduct.  Her initial disclosures provided nothing regarding her claim of damages and her deposition testimony regarding damages was a refusal to answer.  Meehan Depo. at 107-08.  Her effort to plug the hole with arguments in her brief not only falls flat on the merits because the proffer is irrelevant and illogical, Sheinkopf, 927 F.2d at 1262 (court need not draw inferences that are implausible), but also because it is inadequate as a matter of law.  Garmon, 844 F.3d at 315 (court may disregard what is nothing more than unsupported assertions).

Based on the foregoing, and in reliance on Scott and progeny, I find that the Court must sweep aside the tangled web that Ms. Meehan and Mr. Williamson have woven[29]; when it is gone, what remains is the undisputed evidence proffered by Quicken, which establishes that it is entitled to judgment as a matter of law.

## IV. CONCLUSION

Based on the foregoing, I recommend that Quicken Loans' motion for summary judgment (ECF No. 46) be granted and that the Court enter judgment as a matter of law against Ms. Meehan and in favor of Quicken Loans. Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 1, 2021

---

[29] Over two centuries ago, Sir Walter Scott famously wrote, "what a tangled web we weave . . . [w]hen first we practice to deceive." Sir Walter Scott, Marmion, canto VI, st. 17 (1808). Scott's discerned wisdom occasionally has been deployed in judicial opinions to characterize cases where the underlying factual scenario evokes the theme behind Scott's words. See, e.g., Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 32 (1st Cir. 2020). I find that Ms. Meehan's presentation to this Court makes this one such case.

34